UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

ELIZABETH FRY FRANKLIN ET AL      CASE NO.  5:16-CV-01152 LEAD
     CIVIL NO. 5:17-1047 (MEMBER)

VERSUS      JUDGE TERRY A. DOUGHTY

REGIONS BANK      MAG. JUDGE KAYLA D. MCCLUSKY

## OPINION

A bench trial was held in this matter in Shreveport, Louisiana, on April 19, 20, 21, and 22, 2021. After closing arguments, the matter was taken under advisement by the Court.

The Court hereby enters the following findings of fact and conclusions of law. To the extent that any finding of fact constitutes a conclusion of law, the Court hereby adopts it as such. To the extent that any conclusions of law constitute a finding of fact, the Court hereby adopts it as such.

## I. FINDINGS OF FACT

The plaintiffs, Elizabeth Fry Franklin ("Franklin"), Cynthia Fry Peironnet ("Peironnet"), and Eleanor Baugnies de St. Marceaux ("Baugnies"), own an undivided interest in a 1,805.34-acre tract of land ("The Farm") in Caddo Parish, Louisiana. Franklin and Peironnet each own a two-sixth interest in the property. Baugnies owns a one-sixth interest in the property. [1]

The Farm sits over an area of Northwest Louisiana known as the Haynesville Shale Formation ("Haynesville Shale"). The Haynesville Shale is a rock formation that lies at depths of 10,500 feet and more below the land's surface. The Haynesville Shale contains vast quantities of natural gas. Although this was known prior to 2008, the technology was not present to extract the

---

[1] Pamela J. Comegys, who also owns an undivided one-sixth interest in the tract, is not a party in this proceeding.

natural gas at these depths. Oil and gas were being extracted from the Cotton Valley area ("Cotton Valley"), which is a sandstone area above the Haynesville Shale.

In March of 2008, it was announced that oil and gas companies would be obtaining leases to extract natural gas from the Haynesville Shale. This announcement set off what has been referred to as a "modern day gold rush," resulting in skyrocketing lease bonus payments for oil and gas leases in this area.

Plaintiffs contend that as a result of a mishandled lease extension by John Moore ("Moore") of Regions Bank in 2007, they lost millions of dollars in potential lease bonus payments and royalties.

Plaintiffs Franklin and Peironnet had separate, written Agency Agreements with Regions (PX-1 and PX-2) to manage their oil, gas, and other mineral interests. Plaintiff Baugnies did not have an oil, gas, and minerals contract with Regions. She did have a Real Estate Management Agency Agreement with Regions (DX-4), which covered services such as rental and leasing of property, sales negotiations, payment of real estate taxes, and other similar matters. However, the Real Estate Management Agency Agreement did not provide coverage for oil, gas, and other mineral interests.

Although Baugnies did not have a written agency agreement with Regions to manage her mineral interests, she maintains that she had an oral or implied contract with Regions to manage her oil, gas, and other mineral interests.

## A.  PRESTIGE LEASE NEGOTIATIONS

In 2004, Region's employee Joey Hand ("Hand"), who was handling the mineral interests of Franklin and Peironnet, negotiated and entered into (on behalf of Franklin and Peironnet), a paid-up oil and gas lease (PX-3) with Prestige Exploration, Inc. ("Prestige"). The lease was for a

2

three-year term beginning on June 22, 2004, and it provided for a $100.00 per acre lease bonus and royalties of twenty percent (20%) of the gross proceeds received or a fair and reasonable price, whichever is higher. The Paid-Up Oil and Gas Lease ("Prestige Lease") was recorded in the conveyance records of Caddo Parish on August 26, 2004. The Prestige Lease was subsequently assigned to Matador Resources ("Matador") on October 13, 2004 (PX-4).

Matador was developing the Cotton Valley formation, which is in an area above the Haynesville Shale formation. Due to a horizontal land depth clause in the lease, the Prestige Lease would expire below the specified depth at the end of the three-year lease term. Additionally, Matador had not drilled on a portion of the leased property, which would have resulted in the lease expiring on a portion of the property, specifically, 168.95 acres.

### B.  NEGOTIATIONS TO EXTEND THE PRESTIGE LEASE

In June of 2007, prior to the time the Prestige Lease expired, Matador approached Regions to extend the Prestige Lease. Matador sought to extend the Prestige Lease as to the 168.95-acre tract, as this was an area that would have expired at the end of the three-year term of the Prestige Lease.

Hand had handled the negotiations for Franklin and Peironnet[2] when the Prestige Lease was signed in 2004, but the Franklin and Peironnet files had been transferred from Hand to Moore, a Regions geologist and landman, who also handled oil, gas, and mineral management for Regions to its customers.

Matador representative Russell Mouton ("Mouton") spoke with Moore for the first time on May 14, 2007, regarding the proposed lease extension. Mouton initially offered Moore $33.00 per

---

[2] Baugnies signed the Prestige Lease personally, without advisement of Regions Bank or any of its employees.

acre in lease bonuses for the extension to the 168.95 acres. Moore wanted more money for the extension and countered at $100.00 per acre.

Moore told Mouton he was only negotiating the lease extension on behalf of Franklin and Peironnet and not on behalf of Baugnies, who did not have a written mineral contract with Regions. Moore also told Baugnies that she did not have a contract with Regions, and that he was not negotiating on her behalf. Thereafter, Mouton dealt directly with Baugnies.

Eventually, Moore worked out an agreement with Kevin Donahue of Matador for a lease extension of the 168.95 acres for eighteen (18) months with a lease bonus of $75 per acre. The lease extension, along with the checks for the lease bonus totaling $4,224.00 were mailed to Moore by Mac Guarino ("Guarino") on August 22, 2007 (DX-22). Moore signed the lease extension on behalf of Franklin and Peironnet on August 22, 2007, and he mailed the executed lease extension to Guarino of Coastal Land Services, Inc. (who was representing Matador) on August 23, 2007 (PX-42).

The lease extension was either delivered or mailed to Baugnies, who personally signed it. The lease extension was recorded in the conveyance records of Caddo Parish on September 26, 2007 (PX-5).

The extent of the lease extension (PX-5) resulted in a state court lawsuit. According to Moore, he only intended to extend the lease as to the 168.95 acres. However, the wording of the lease extension extended the entirety of the acreage (1,805.34 acres), and it also included the deep rights that were set to expire on August 23, 2007.

The deep rights became a huge issue after the Haynesville Shale was announced in March of 2008. The extension of the deep rights to the property caused a cloud on the title of Plaintiffs and their ability to lease the deep rights to the property.

### C.  PETROHAWK LEASE NEGOTIATIONS

In late April of 2008, Petrohawk Energy Corp. ("Petrohawk") approached Hand (who had since been given back the Franklin and Peironnet files from Moore) about leasing the deep rights to the properties above the Haynesville Shale area that Regions was managing. Hand then sent Petrohawk a spreadsheet of the Haynesville Shale properties Regions was managing.

On May 4, 2008, John W. Walsh, on behalf of Petrohawk, emailed an offer letter (PX-20) to Regions for certain properties, which included Plaintiffs' tracts. The offer letter offered to acquire oil and gas leases from the Trust Department of Regions, which included Plaintiffs' property, under the following terms:

1)  $8,750 per acre lease bonuses for the acreage;

2)  royalties of 25%; and

3)  primary term of three (3) years.

The offer was contingent upon the owners being able to lease all depths of the Haynesville Shale rights, sufficient time to research and approve title, and proper execution of the leases.

The offer letter stated that the offer would only be open for three days, that is, until May 7, 2008. On May 7, 2008, the Petrohawk letter was accepted by Regions Vice President Edward Waller ("Waller"). At the time the offer was accepted, the offer of $8,750.00 per acre was higher than other lease bonus payments[3] and was called a "miraculous deal" by Hand. The lease bonus was 87.5 times the $100.00 lease bonus Plaintiffs had received when the Prestige Lease was signed in 2004.

---

[3] According to the testimony of Dr. Loren Scott and David Fuller.

### D.  STATE LAWSUIT WITH MATADOR

Previously, Hand had met with Matador representatives about what he perceived to be an "error" in the lease extension. Matador refused to pay Franklin, Peironnet, or Baugnies anything. This resulted in Hand contacting and hiring attorneys to represent Franklin and Peironnet and to file suit against Matador to have the lease extension reformed.

The state lawsuit on behalf of Franklin and Peirnnot was filed in Caddo parish state court on May 15, 2008. Baugnies was later added as a Plaintiff. In the state proceeding, several the plaintiffs' claims were dismissed at summary judgment stage, which left only plaintiffs' claims of mutual error and fraud.

In September 2010, after a five-day trial, a jury found Plaintiffs had not proven mutual error[4] and dismissed Plaintiffs' claims against Matador. On appeal, the Second Circuit Court of Appeal found legal error in the Court's jury instructions regarding reformation of written contracts, reviewed the record de novo, and reversed the trial court's decision. The Court of Appeal reformed the lease extension to only include the 168.95 acres and not the deep rights. Peironnet v. Matador Res. Co., 47,190 (La. App. 2 Cir. 8/1/12), 103 So. 3d 445, writ granted, 2012-2292 (La. 1/11/13), 106 So. 3d 541, and writ granted, 2012-2377 (La. 1/11/13), 106 So. 3d 542, and rev'd, 2012-2292 (La. 6/28/13), 144 So. 3d 791.

The Supreme Court of Louisiana granted writs and reversed the Court of Appeal's decision, finding no mutual error. Peironnet v. Matador Res. Co., 2012-2292 (La. 6/28/13), 144 So. 3d 791. The effect was that Matador won, and the lease extension in favor of Matador extended to the entire 1,805.34-acre tract, including the deep rights.

---

[4] The fraud claim was dismissed on a directed verdict.

### E.  SIGNING OF PETROHAWK LEASE

The Petrohawk offer letter (PX-20) had been accepted by Regions' Vice President Waller on May 7, 2008. On July 10, 2008, John Walsh of Petrohawk sent an email to Waller and Hand of Regions (PX-16), agreeing to lease the plaintiffs' entire 1,805.34-acre tract at $8,750.00 per acre lease bonus and a royalty of 25%. Additionally, the 168.95 acres was to be leased separately, and the $8,750.00 per acre bonus as to the 168.95-acre tract would be escrowed, pending the outcome of the state-court litigation. Petrohawk also agreed to bear the cost of having the state court suit prosecuted, up to $50,000.00.

The Petrohawk lease was then signed as to Franklin and Peironnet on July 16, 2008 (PX-12) and recorded in the conveyance records of Caddo Parish on October 15, 2008. A separate Petrohawk lease was signed with Baugnies (PX-10) on July 17, 2008.

### F.  EVENTS LEADING TO SUIT AGAINST REGIONS

Although Petrohawk's $8,750.00 per acre lease bonus offer was high when made on May 4, 2008, the same cannot be said for the prices of lease bonus offers when the Petrohawk leases were signed in July of 2008. The lease bonuses in the Haynesville Shale region spiked to their highest level in July and August 2008, before receding shortly thereafter. After August 2008, there was a dramatic drop in the bonus prices due to a dramatic drop in prices of natural gas.[5] By November 2008, lease bonuses were back down to what they were before March 2008.[6]

Plaintiffs maintain their damages for the lease bonuses should be based upon the average lease bonus price of $25,000 per ace in July 2008, while Regions maintains the damages for lease bonuses should be based upon the lease bonus prices in May 2008, when Petrohawk offered the $8,750.00 per acre.

---

[5] Dr. Loren Scott testimony
[6] *Id.*

Additionally, Plaintiffs allege damages for past and future royalties based upon the differences between 20% royalties in the 2004 Prestige lease and 25% royalties in the Petrohawk lease.

On August 5, 2016, Franklin and Peironnet filed a Complaint against Regions Bank, alleging breach of contract by Regions of Regions' obligations in the Franklin and Peironnet Agency Agreements. Franklin and Peironnet allege that the signing of the lease by Moore caused a cloud on their title to their deep rights On August 27, 2017, Baugnies filed an almost identical suit against Regions, except to allege the violation of an oral or implied contract by Regions to manage her mineral rights. The two suits have been consolidated. The issues in this case are as follows:

1) Whether Baugnies had an oral or implied contract with Regions to manage her mineral interests;

2) Whether there was a breach of contract by Regions;

3) Whether the exculpatory clause in the Agency Agreements of Franklin and Peironnet relieves Franklin and Peironnet's claims against Regions; and/or

4) Whether the plaintiffs are entitled to damages against Regions for loss of royalties and lease bonuses.

## II.      CONCLUSIONS OF LAW

### A.  BAUGNIES ORAL OR IMPLIED CONTRACT WITH REGIONS

The first issue to be addressed is whether Baugnies had an oral or implied in fact contract for mineral advice with Regions. In a breach of contract claim, the plaintiff must first prove the existence of a contract. New Orleans Craft Temple, Inc. v. Grand Lodge of Free & Accepted Masons of the State of Louisiana, 13-525 (La. App. 5 Cir. 12/19/13), 131 So. 3d 957, 964.

8

Baugnies has the burden of proof to prove a contract with Regions for mineral management existed.

As previously determined by the Court [Doc. No. 153], a mandate is not required to be in writing. La. Civ. Code Ann. art. 2993. Woodward v. Steed, 28,676 (La. App. 2 Cir. 9/25/96), 680 So. 2d 1320, writ not considered, 96-2648 (La. 12/6/96), 684 So. 2d 411. Additionally, as required by La. Civ. Code Ann. art. 1846, an oral contract greater than $500.00 must be proven by at least one witness and other corroborating circumstances.

To meet this burden of proof, a party may serve as its own witness, but the corroborating circumstances required may come from a source other than the party. The corroborating circumstances may be general and need not prove every detail of a party's claim. Steve Owens Constr., Inc. v. Bordelon, 2017-1320 (La. App. 1 Cir. 2/27/18), 243 So. 3d 601, 605; Archaga v. Johnson, 19-85 (La. App. 5 Cir. 10/16/19), 280 So. 3d 331, 340, writ denied, 2019-01837 (La. 1/14/20), 291 So. 3d 682; Morris v. Pratt, 114 La. 98, 38 So. 70, 71 (1905).

Baugnies can be her own witness and has provided corroborating circumstances. It is then necessary for this Court to weigh the testimony and evidence presented on this issue to determine whether Baugnies has met her burden of proving an oral or implied in fact mandate for Regions to manage her mineral interests.

Baugnies did not have a written agreement with Regions to manage her minerals, while both Franklin (PX-2) and Peironnet (PX-1) did. Baugnies had a Real Estate Management Agency Agreement (DX-4) with Regions, which did not cover oil, gas, and minerals.

Hand testified that when he was negotiating the 2004 Prestige lease, he only negotiated for Franklin and Peironnet. Hand also testified that he did not represent Baugnies with respect to her mineral interests. It is important to note that prior to the 2004 Prestige lease being signed, Hand

found Regions had no written mineral management agency agreement with Franklin, so he remedied this situation, and she signed one. (PX-2). Hand did not have Baugnies sign a written agreement because he was not representing her interests.

Other than the $150.00 per month that Regions was charging Baugnies under the Real Estate Management Agreement (DX-4), Baugnies was never charged anything by Regions Bank until after the Petrohawk lease in 2008. Both Franklin and Peironnet were charged by Regions.

Hand testified that his relationship with Baugnies between 2001-2006, was that he spoke to her a few times on the phone. Hand acknowledged sending Baugnies a letter on May 29, 2005 (PX-66) regarding a mineral lease, but that lease was signed by Baugnies, individually, and not by Hand on her behalf. Hand testified that he was not representing Baugnies' interest and was talking to her as a courtesy because he represented Franklin and Peironnet, who were co-owners with Baugnies on the same tract.

All of the documents on mineral activity that Baugnies participated in were signed by Baugnies individually, while Hand signed on behalf of Franklin and Peironnet. Additionally, her portion of the proceeds were also sent to Baugnies directly while the proceeds of Franklin and Peironnet went to Regions.

Hand was not involved in any negotiations with regard to the lease extension at issue, as the Region files had been sent to Moore by this time. Hand denied giving any advice to Baugnies to sign the lease extension.

As to the 2008 Petrohawk lease, Hand testified he had retained the Franklin and Peironnet files back from Moore in August of 2007. Hand testified that he negotiated the Petrohawk lease on behalf of Franklin and Peironnet, but not on behalf of Baugnies. Hand signed the Petrohawk lease (PX-13) on behalf of Franklin and Peironnet but not on behalf of Baugnies. Baugnies signed

the Petrohawk lease individually. However, after the Petrohawk lease was signed, Regions did charge Baugnies a fee of approximately $269,000.000 for the Petrohawk lease, despite not having a signed Agency Agreement with Baugnies. The explanation given by Hand for charging Baugnies was that he was "told he had to." Hand testified that this was the first time Baugnies had been charged by Regions for mineral activity.

Baugnies testified that she is an artist with a degree from a college of fine arts. She had no experience in managing land and/or minerals. She admitted she never signed a written mineral management agreement with Regions, but she stated that she relied on Hand to give her advice. She provided documentation of Hand sending documents to her to sign (PX-66 and PX-74), but she admitted to signing individually and receiving the money directly.

Baugnies further testified that no one ever asked her to sign a mineral management agreement and that she was always invited to Carol Rushton's ("Rushton") annual meetings for bank clients (DX-25). Additionally, she did admit that the account statement sent to her by Carol Rushton (DX-08) did not list her interest in the 1,805.34 acres. Baugnies also testified that she was not positive exactly which representative of Regions she actually had an oral contract with, but she stated that she thought it was probably Rushton.

Rushton was the Regions Trust Relationship Manager. She did not have experience in managing minerals and did not manage minerals. Rushton testified that Baugnies did not have a written agreement with Regions regarding minerals, but Rushton never told Baugnies that Regions would not manage her minerals. Significantly, Rushton did not testify that she had an oral agreement with Baugnies regarding management of minerals. She also testified that Baugnies annual report to her did not have Baugnies' interest in the 1,805.34 acres listed.

This Court will also examine whether Regions had any oral or implied in fact mandate to manage Baugnies' minerals when the lease extension at issue was completed in 2007. There is even less evidence supporting an oral or implied-in-fact mandate as to the lease extension. Hand testified he did not handle the lease extension and did not advise Baugnies to sign it.

Rushton testified that after Regions' merger with AmSouth in 2006, the Shreveport area accounts (including the accounts of Franklin, Peironnet, and Baugnies) were transferred to Moore in Shreveport. Rushton never received a phone call or letter from Moore, and the only contact she testified ever having had with him was a verbal confrontation on one occasion.

Rushton further testified that Baugnies called her and was distraught because Moore told Baugnies that she did not have an account with Regions regarding minerals, and that he could not advise her.  Rushton was successful in having the plaintiff's files returned to Hand in 2007 (after the extension).

Moore was a certified petroleum geologist, certified petroleum geologist, and certified mineral manager for Regions. He only managed the Franklin and Peironnet files for a short period of time. He did speak with Baugnies on one occasion, in which he told her that he could not advise her because Regions did not have a mineral management contract with her. Moore began working on the lease extension in June of 2007, after having contact with Mouton. The lease extension was signed by Moore on behalf of Franklin and Peironnet (PX-5). Baugnies signed the extension herself.

Mouton gave some important testimony regarding the lease extension. He was the agent for Matador to negotiate the lease extension. Mouton took detailed notes of his negotiations (PX-146A). After learning that Hand was no longer managing the Franklin and Peironnet account, Mouton made contact with Moore on May 16, 2007. On May 22, 2007, Mouton told Moore that

12

he had received a call from Baugnies asking him about details regarding Regions' management of Franklin and Peironnet's interests. Moore told Mouton that Regions did not represent Baugnies' mineral interests.

From then on, Mouton talked directly to Baugnies about the extension. Mouton reported in his notes that he talked to Baugnies on May 15, 2007, and Baugnies told Mouton that Hand was no longer handling her account. Baugnies told Mouton that she would do whatever Franklin and Peironnet did. Baugnies told Moore the same thing on May 24, 2007.

On May 31, 2007, Baugnies called Mouton directly and asked him how things were going with the negotiations with Regions. She told Mouton that she was represented by Regions, but she had the royalties mailed directly to her.

On June 6, 2007, Mouton called Baugnies and made her an offer of $50.00 per acre for the lease extension. Mouton testified when the extension was finally completed, it involved two separate transactions—one with Moore and one with Baugnies.

Baugnies testified that she talked to Moore about the lease extension, and Moore was rude to her and told her Regions did not represent her. She immediately called Rushton to report. Baugnies further testified that she was advised by Regions to sign the lease extension and that she signed it. Baugnies did not say who at Regions advised her to sign the lease extension. She was not charged anything by Regions for the lease extension.

After examining the evidence and reviewing the testimony at trial, this Court finds that Baugnies has not met her burden of proof in proving that she had an oral and/or implied-in-fact agreement with Regions. Her strongest argument is that she had an oral contract when the 2008 Petrohawk lease was signed. However, this was after the lease extension at issue. Baugnies has not proven she had an oral or implied-in-fact contract with Regions prior to 2008 and certainly not

13

at the time the lease extension at issue was negotiated and signed. Although Baugnies testified that she was told by Regions to sign the extension, she did not know who had told her to do so. Hand was not handling the transaction. Moore told her he did not represent her, and Rushton was not a mineral management agent for Regions and/or had no authority to manage minerals.

### B.  BREACH OF CONTRACT

The next issue is whether there was a breach of contract by Regions to Franklin and Peironnet (collectively, "Plaintiffs").[7] Both Franklin and Peironnet had Agency Agreements with Regions to manage their mineral interests (PX-2, 1). Plaintiffs have alleged that Regions, through its employee Moore, breached Paragraph G and H of the Agency Agreements, which read as follows:

> G.  To execute, acknowledge and deliver oil, gas and mineral leases containing such terms and provisions as the Bank shall deem proper, including the granting to the lessee the right to pool or utilize the land and interest owned by Owner for the purposes of mineral development with other lands and leases.
> H.  To execute, acknowledge and deliver surface leases, restrictions, division orders, transfer orders, oil or gas unitization agreements, easements, right-of-way conveyances, mineral exploratory or development contracts.

(PX-1, PX-1).

On June 24, 2004, Regions, through Hand, negotiated and signed, on behalf of Plaintiffs, a Paid-up Oil and Gas Lease (PX-3) in favor of Prestige for Plaintiffs' interest in the 1,805.34-acre tract in Caddo Parish. The primary term of the lease was for three (3) years. The lease also continued a horizontal Pugh clause and a depth severance clause. On September 24, 2004, Prestige assigned the 2004 lease to Matador Resources Company (PX-4).

From 2004 to 2007, Matador conducted oil, gas, and mineral development on portions of the 1,805.34-acre tract. However, prior to the expiration of the three (3) year term, Matador had only drilled in the Cotton Valley formation, which was above the Haynesville Shale formation. As

---

[7] It has been determined that Baugnies did not have an oral agreement with Regions regarding mineral interests.

a result of the 2004 lease's depth clause, all depths lying below the Cotton Valley formation, which would include the Haynesville Shale formation, would have lapsed without an extension. Additionally, without an extension of the three (3) year term, due to the horizontal Pugh clause in the 2004 lease, the lease would have lapsed with regard to the 168.95 acres, which had not been developed by Matador.

To keep the lease from expiring as to the 168.95 undeveloped acreage, Matador, through Mouton, contacted Moore to begin negotiations to extend the 168.95 undeveloped acreage. Mouton initially offered a $33.00 per ace lease bonus for the acreage for a twelve-month extension. A copy of the proposed lease extension was sent by Mouton to Moore to review. After further negotiations by Moore with Guarino, they came to an agreement to extend the term for eighteen (18) months to the 168.95-acre tract at $75.00 per acre lease bonus. On August 22, 2007, Guarino sent Moore an Amendment of Oil and Gas lease (DX-22) for an eighteen (18) month period, along with bonus checks for Plaintiffs totaling $4,224.00. Moore confirmed that the Amendment sent by Guarino on August 22, 2007 was the exact same as the proposed lease extension that Mouton had previously sent to Moore, with the exception that twelve (12) months was changed to eighteen (!8) months for the term of the extension.

Moore signed the Amendment of Oil and Gas Lease (PX-5) sent by Guarino and returned it to Guarino on August 23, 2007 (DX-23). As well-documented by the testimony of Moore, the testimony of Hand, the testimony of Edward Waller, the testimony of J.D. Collinsworth ("Collinsworth"), and in the state court proceeding (Peironnet, 2012-2292 La. 6/28/13) Moore failed to limit the lease extension to the 168.95 acres discussed, and the lease extension had the legal effect of extending the entire 2004 lease for eighteen (18) months, including the deep rights. No consideration was paid by Matador for the extension of the deep rights.

15

Moore testified that his intention was to only extend the 168.95 acres and that he never brought up or discussed an extension or limitation of the deep rights. He testified that this was a "mutual error."

A few months later, in late March of 2008, the deep rights became valuable due to the announcement of the Haynesville Shale.

Collinsworth, who qualified as an expert landman, testified that Moore's failure to limit the lease extension to 168.95 acres, the failure to exclude or even discuss the deep rights, and failure to get any compensation for the deep rights was a violation of the standard of care of a landman. Although the deep rights were not being actively marketed at that time, they did have some value. He testified that Moore gave away the deep rights for no consideration.

Wray Pearce ("Pearce"), who testified as an expert in agency agreements for oil, gas, and mineral matters, testified that Moore followed the standard of care under the Agency Agreements and acted in the best interest of the clients. Pearce further testified that Moore was allowed to make judgments in the Agency Agreements.

After the evidence and testimony, this Court believes John Moore violated the standard of care of a landman in signing the lease extension without limiting the extension to 168.95 acres, in failing to limit the deep rights to the property, and/or in failing to receive any compensation for the deep rights.

The next issue is whether the exculpatory clauses of the Franklin and Peironnet Agency Agreements apply.

### C.  EXCULPATORY CLAUSE

Both the Franklin and Peironnet Agency Agreements (PX-2, PX-1) contained an exculpatory clause, which reads as follows:

16

> The bank shall never be individually liable or responsible to Owner for any loss, damage or injury sustained by reason or account of any mistake in judgment of the Bank occurring in connection with the exercise of these powers of attorney or that may be granted by any other power of attorney or delegation of authority to act; and Owner, to induce Bank to accept this appointment, hereby releases and forever discharges the Bank from any and all liability and responsibility for any and all such loss, damage, and injury.

(PX-1, PX-2).

Franklin and Peironnet first argue that the exculpatory clause does not apply by its own terms, since the actions of John Moore were not a "mistake in judgment." Plaintiffs refer to the definitions of "mistake" and "judgment: in the Cambridge Dictionary and argue that a "mistake in judgment" means taking action based upon a considered decision that, in hindsight, turns out to be incorrect. Plaintiffs further argue that Moore never took any action based upon considered judgment and argues that Regions is liable due to Moore's failure to read or understand the terms of the lease extension.

Regions argues their contracts limiting liability are generally valid and enforceable and that Louisiana law allows a person to waive their right to assert another's negligence. Additionally, Regions maintains that Plaintiffs are seeking damages as a result of Regions carrying out its duties under the Agency Agreements, to wit—entering into the Lease Extension.

Plaintiffs' claims of fault as to Moore/Regions are that Moore executed the lease extension without limiting the acreage to 168.95 acres, and in executing the lease extension without excluding the deep rights.

Shortly before the negotiations began on the lease extension, Moore was transferred the file for Plaintiffs. Moore and Mouton then engaged in several back and forth calls

Eventually, the file went to either Donahue or Guarino, and an agreement was reached to extend the lease for eighteen (18) months, rather than twelve (12) months, with a $75.00 per acre lease bonus.

On August 22, 2007, Guarino sent Moore the original Amendment of Oil and Gas Lease for an eighteen (18) month term (DX-22), along with lease bonus checks for Plaintiffs totaling $4,224.00. Moore signed the eighteen (18) month lease extension on behalf of Plaintiffs and mailed the signed extension back to Guarino on August 23, 2007 (DX-23).

According to Moore's testimony, he only intended the lease extension to extend 168.95 acres. He admitted that it was a "mutual mistake" to sign it but based upon the amount of bonus rental paid ($4,224.00), he thought the lease only extended to the 168.95 acres. He admitted he could have revised it. He testified that he read the lease extension before he signed it, but it was only his intention to extend the lease to the 168.95 acres.

The word "mistake" is defined by Black's Law Dictionary as "an error, misconception, or misunderstanding; an erroneous belief." *Black's Law Dictionary* 1153 (10th ed. 2009). The word "judgment" is defined as "the mental faculty that causes one to do or say certain things at certain times, such as exercising one's own discretion or advising others; the mental faculty of decision making." *Id*. at 970.

The testimony and evidence show that Moore engaged in negotiations to get a better price for his clients, read the lease extension, and based upon his discussions, correspondence, map, amount of bonus checks, simply failed to comprehend that the lease extension extended the entire lease, including the deep rights. This Court believes what Moore did was a "mistake in judgment" and that the language of the exculpatory clause applies to Moore's mistake in signing the lease extension.

However, this does not end the inquiry with respect to the exculpatory clause. As previously ruled on by this Court [Doc. No. 146], La. Civ. Code Ann. art. 2004 nullifies any clause that, in advance, excluded the liability of a party for "intentional or gross fault." There are no allegations of intentional fault by Regions, therefore, the issue is whether there was "gross fault." Plaintiffs maintain that the actions of Moore should be classified as gross fault or gross negligence, which would mean that the exculpatory clause would not apply. This court previously denied Regions Motion for Summary Judgment [Doc. No. 124], by finding that the issue of whether Moore/Regions' conduct constitutes gross negligence was an issue of fact that precluded summary judgment [Doc. No. 146].

The actions of Moore in negotiating and signing the 2007 lease extension have been previously discussed and will not be repeated again. The Supreme Court of Louisiana, in Ambrose v. New Orleans Police Dept. Ambulance Service, 639 So.2d 216 (La 1994), addressed "gross negligence" and held:

> Louisiana courts have frequently addressed the concept of gross negligence. Gross negligence has been defined as the "want of even slight care and diligence" and the "want of that diligence which even careless men are accustomed to exercise." State v. Vinzant, 200 La. 301, 7 So. 2d 917 (1942), 7So.2d 917 (La 1942). Gross negligence has also been termed the "entire absence of care" and the "utter disregard of the dictates of prudence, amounting to complete neglect of the rights of others." Hendry Corp. v. Aircraft Rescue Vessels, C-77436 & C-77439, 113 F. Supp. 198 (E.D. La. 1953). Additionally, gross negligence has been described as an "extreme departure from ordinary care or the want of even scant care." W. Page Keeton, et. al., Prosser & Keeton on the Law of Torts, § 34, at 211 (5th ed. 1984); 65 C.J.S. Negligence § 8. "There is often no clear distinction between such [willful, wanton, or reckless] conduct and 'gross' negligence, and the two have tended to merge and take on the same meaning." Falkowski v. Maurus, 637 So. 2d 522 (La. Ct. App. 1993), writ denied, Falkowski v. Maurus, 629 So. 2d 1176 (La. 1993) (quoting Prosser & Keeton, supra, at 214)). Gross negligence, therefore, has a well-defined legal meaning distinctly separate, and different, from ordinary negligence.

Ambrose v. New Orleans Police Dep't Ambulance Serv., 93-3099 (La. 7/5/94), 639 So. 2d 216, 219–20.

Additionally, the Court in Houston Expl. Co. v. Halliburton Energy Servs., Inc., 269 F.3d 528 (5th Cir. 2001), in examining "gross negligence" under Louisiana law stated:

> Under Louisiana law, gross negligence is willful, wanton and reckless conduct that falls between intent to do wrong and ordinary negligence.  We stated in *Orthopedic & Sports Injury Clinic v. Wang Laboratories, Inc.,* that "[g]ross negligence is substantially and appreciable higher in magnitude than ordinary negligence."  Other courts have defined gross negligence as the "entire absence of care," the "want of even slight care and diligence," and the "utter disregard of the dictates of prudence, amounting to complete neglect of the rights of others. At least one Louisiana court stated that one is grossly negligent when he "has intentionally done an act of unreasonable character in reckless disregard of the risk known to him, or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow." Mere inadvertence or honest mistake does not amount to gross negligence.

268 F.3d 528 at 531-32.

This Court does not believe that the actions of Moore were gross negligence. The whole set of facts surrounding the lease extension show that Moore refused to accept Matador's lower offers and eventually raised the per acre laese bonus from $33.00 to $75.00 per acre. He testified that he read the document and based upon prior conversations, correspondence and lease bonus payments, Moore failed to comprehend that the lease extension extended the entire lease, including the deep rights. It was negligent but not an "entire absence of care" or "complete neglect of the rights of others." The lease extension was signed approximately seven (7) months before the Haynesville Shale was announced. Although Moore should have been aware that the deep rights had some value, no one could have predicted what was going to occur in 2008 with regard to the value of deep rights.

Plaintiffs' final argument with regard to the exculpatory clause of the Agency Agreement is that the exculpatory clause is overbroad in that it does not eliminate liability for Regions due to

intentional or grossly negligent conduct. Regions maintains that the overbreadth of Regions exculpatory clause should result in nullity of the exculpatory clause in the Agency Agreements. However, Plaintiffs do not support this position with statutory or case law.

La. Civ. Code Ann. art. 2004 states that any "clause" that excludes or limits liability for intentional or gross fault is null. The exculpatory clause at issue here does not attempt to exclude or limit liability for intentional or gross fault. If it did, their "clause" would be null. By restricting the nullity just to that "clause," the implication is that the rest of the exculpatory clause is valid.

For the reasons set forth herein, Regions Bank's exculpatory clause in the Agency Agreement for Plaintiffs applies, relieving Regions from Plaintiffs' claims against them.

### D.  DAMAGES

Damages will also be addressed by the Court.

Plaintiffs argue their damages should be determined as of the date of the Petrohawk lease on July 16, 2008 (DX-28). Defendant maintains the damages should be determined on May 7, 2008, when Waller accepted the Petrohawk lease offer of $8,750.00 per acre lease bonus on behalf of Plaintiffs. The average lease bonuses were much higher on July 16, 2008 than on May 7, 2008. Additionally, Plaintiffs claim they are entitled to damages for past and future royalties based upon the difference between 20% royalties in the 2004 Prestige lease and 25% royalties in the Petrohawk lease.

Several experts weighed in on the damage issue at trial with the experts for Plaintiffs using the July 16, 2008 date and experts for Defendant using the May 7, 2008 date. Plaintiffs argue that the July 16, 2008 date should be used because there was no binding contract with Petrohawk until July of 2008. Regions argues that the May 7, 2008 date should be used because there was a binding contract when Waller accepted the agreement on May 7, 2008.

Plaintiffs' damage experts were Skip Peel ("Peel") and Robert McGowen ("McGowen"). Peel was accepted as an expert mineral consultant. He was aware of the lease bonus prices that owners were receiving during the Haynesville Shale run. He used the Sunrise oil and gas database along with a website, www.GoHaynesvilleShale.com, to calculate lease bonus prices. He also had remote access to parish records. Peel testified that the average lease bonus prices in July of 2008 were $25,000.00 per acre, with a high of $30,000.00 per acre.

McGowen was a consulting petroleum engineer who was accepted as an expert in lost royalty and lease bonus income. In calculating lost royalties, McGowen found that the difference in royalty payments (20% versus 25%) from 2009 to 2017 for the Plaintiffs' five-sixth (5/6) interest would total $4,312,840.00. He also calculated future loss of royalty income from 2018 to the life of the well. McGowen testified that the lost future royalty income was $1,961,491.00. Therefore, McGowen calculated both past and future royalty losses totaling $6,274,331.00.

As to the loss of lease bonus income, McGowen found the July-August 2008 average lease bonuses were $24,330.00 per acre. To calculate the bonus loss for Plaintiffs' five-sixth interest on approximately 1636.39 acres (1805.34 minus 168.95), McGowen subtracted the $8,750.00 per acre received by Plaintiffs from the Petrohawk lease from the average lease bonus in July-August of 2008, and he found lease bonus damages of $21,246,230.00.

Therefore, McGowen testified that total damages to the Plaintiffs as a result of loss of royalty and lease bonuses together, totaled $27,246,561.00

Regions damage experts were Phillip Asprodites ("Asprodites"), Dr. Loren Scott ("Scott"), and David Fuller ("Fuller"). Asprodites was accepted as an expert in the customs of the oil and gas industry, he testified that there was no market for deep rights below the Cotton Valley formation prior to the announcement of the Haynesville Shale. He also testified that at the time of the

Petrohawk lease offer in May of 2008, the offer of $8,750.00 per acre in lease bonuses was higher than the other bonuses in May of 2008.

Scott was accepted as an expert economist as to Louisiana economics and the energy sector. Scott testified that in May of 2008, the market price of lease bonuses was lower than the $8,750.00 that Petrohawk offered. He also testified that the lease bonuses continued to rise with their highest in July and August of 2008. He testified that after August of 2008, there was a dramatic drop in the lease bonus prices due to a dramatic drop in the price of natural gas because of the 2008 recession. Due to demand dropping as a result of the recession and an increased supply of natural gas, the prices of natural gas dropped from $12.27 in July of 2008 to $2.81 per million British thermal units (MMBTU) in July of 2009. Scott also testified that the cost to drill a well in the Haynesville Shale was much higher than in the Cotton Valley.

Fuller was accepted as an expert financial analyst. He reviewed McGowen's report and gave an alternate damage analysis. Fuller testified that he disagreed with McGowen on both the royalty and lease bonus damage issue. Fuller testified that the 20% gross proceeds lease with Matador was actually superior to the 25% value at the well royalty in the Petrohawk lease. In other words, due to the additional costs taken out of the 25% value at the well royalty, Plaintiffs would actually come out better by $948,825.00, meaning there are no damages for Plaintiffs for royalties. Fuller also pointed out that McGowen failed to reduce the future royalty damages to present value, which would have reduced the figure by over $700,000.00.

As to the lease bonus damages, Fuller found no damage to Plaintiffs for lease bonuses. Fuller testified that the average lease bonus being paid in May 2008 was $3,017 per acre. He testified that the lease bonus offered by Petrohawk in May of 2008 was over $5,700.00 per acre, which was more than the average payment at that time. Based upon this much higher than average

lease bonus payment, Fuller testified that Plaintiffs had no damages for lease bonuses since they received much more per acre than the average when Petrohawk's offer was accepted on May 7, 2008. Fuller's bottom-line conclusion was that Plaintiffs suffered zero (0) damages for royalties and lease bonuses.

Regions argues that there was a binding agreement when Regions accepted Petrohawk's offer on May 7, 2008. Plaintiffs argue that there was no binding contract and/or agreement on May 7, 2008, because a counteroffer of a change of terms was made by Petrohawk in July of 2008.

This Court does not believe a binding contract was formed when Waller accepted Petrohawk's offer on May 7, 2008. Petrohawk's offer was contingent upon the owners being able to lease all depths of the Haynesville Shale rights and sufficient time to research and approve title. It took Petrohawk over two months to agree to lease the property. When Petrohawk agreed to lease Plaintiffs' property for $8,750.00 per acre lease bonus with a 25% royalty, some of the terms were changed. Petrohawk offered to escrow the bonuses on the 168.95 acres, depending on the outcome of the state litigation. Additionally, Petrohawk offered to pay up to $50,000.00 of attorney fees in the state proceeding. There were changes in the contract, which would mean Petrohawk made a counteroffer in July 2008, which was ultimately accepted.

Despite this contractual issue, Regions arguments regarding damages is still sound. It does not matter when the contract became valid for purposes of calculating damages. It is a matter of causation. In order to prove breach of contract, a plaintiff must prove a contract existed, that there was a breach of the contract, and that the defendant caused damages to the plaintiff as a result of the breach. New Orleans Craft Temple, Inc., 131 So. 3d at 964.

When Petrohawk made an offer to Plaintiffs in May of 2008, the offer was accepted by Regions on behalf of Plaintiffs. The only reason that a change in the terms was made by Petrohawk

was due to the cloud on title the lease extension created. Had there been no lease extension, the acceptance by Regions would have been binding and would have resulted in Plaintiffs receiving exactly what they received, which was $8,750.00 per acre in lease bonus payments, a 25% royalty, and a three-year term. In other words, the lease extension caused Plaintiffs no damages, since without it, they would still have received the same amount. If there had been no cloud on title by the lease extension, Petrohawk would have still made the same offer, and Regions would have still accepted that offer on behalf of Plaintiffs.

For the above reasons, Plaintiffs have not proven that Regions has caused any damages to Plaintiffs.

## III.    CONCLUSION

For the reasons set forth herein, the claims of Elizabeth Fry Franklin, Cynthia Fry Peironnet, and Eleanor Baugnies de St. Marceaux against Regions bank are **DENIED** and **DISMISSED WITH PREJUDICE**.

MONROE, LOUISIANA, this 12th day of May, 2021.

_____
TERRY A. DOUGHTY
UNITED STATES DISTRICT JUDGE