UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

ELIZABETH FRY FRANKLIN ET AL       CASE NO.  5:16-CV-01152 LEAD

VERSUS                             JUDGE TERRY A. DOUGHTY

REGIONS BANK                       MAG. JUDGE KAYLA D. MCCLUSKY

**MEMORANDUM RULING**

Per a Memorandum Order [Doc. No. 242] dated October 3, 2022, this Court issued a ruling ordering that this proceeding be reopened for the limited purpose of introducing extrinsic evidence to determine the intent of the parties as to the royalty provisions in a 2008 Petrohawk lease. In the October 3, 2022 Memorandum Ruling, this Court found the terms of a 2008 Petrohawk lease[1] were ambiguous requiring extrinsic evidence to be presented.

The hearing on the reopened proceeding was heard in Shreveport, Louisiana on June 20, 2023.  After closing arguments, this matter was taken under advisement. This Court hereby enters the following findings of fact and conclusions of law. To the extent that any finding of fact constitutes a conclusion of law, the Court hereby adopts it as such. To the extent that any conclusion of law constitutes a finding of fact, the Court hereby adopts it as such.

I.    **FINDINGS OF FACT**

The United States Court of Appeals for the Fifth Circuit remanded this case to this Court to determine whether the remaining Plaintiffs, Franklin and Peironnet, suffered damages for the loss of royalties as a result of a difference in royalty rates between an August 2004, Matador lease and an October 2008, Petrohawk lease.

---

[1] [Doc. No. 205-3]

Franklin and Peironnet each owned an undivided one-third (1/3) interest in an 1805.34-acre tract of land ("The Farm") located in Caddo Parish, Louisiana.  The Farm sits over an area in northwest Louisiana known as the Haynesville Shale Formation ("Haynesville Shale").  The Haynesville Shale is a rock formation that lies at depths of 10,500 feet and more below the land's surface.  The Haynesville Shale contains vast quantities of natural gas.  Prior to 2008, technology was not present to extract the natural gas at these depths.

In response to the new technology, oil and gas companies announced in 2008 that they would begin obtaining leases to extract natural gas from the Haynesville Shale. This announcement set off what was referred to as a "modern day gold rush," resulting in skyrocketing lease bonus payments for oil and gas leases in this area.

Franklin and Peironnet had signed Agency Agreements with Regions, which allowed Regions to manage their oil and gas assets.  John Moore ("Moore") had recently taken over the management of Plaintiffs' assets from Joseph Eugene Hand, Jr.  ("Hand").  Plaintiffs contended that as a result of a negligently mishandled lease extension by Regions Bank ("Regions") employee Moore in July 2007, they lost millions of dollars in potential royalties.  The following issues in this matter have been determined.

1) Regions employee Moore was at fault in signing a lease extension for Plaintiffs (intended to only extend the lease as to 168.95 acres), which extended the lease extension by eighteen (18) months as to the entire 1805.34-acre tract;

2) The negligent actions of Moore were not excluded under the Agency Agreements signed by Franklin and Peironnet with Regions; and

3) Franklin and Peironnet did not sustain any damages for lease bonuses.

The previous Opinion,[2] did not resolve the royalty issue, resulting in the present remand.

---

[2] [Doc. No. 207]

The only issues remaining for this Court to determine are whether the differing royalty rates in the 2004 Matador lease and the 2008 Petrohawk lease caused damages to Franklin and Peironnet, and if so, the amount of damages. The Court bifurcated[3] the extrinsic evidence issue from the damage issue, so the present proceeding only is to determine the intent of the parties with regard to the royalty provision of the 2008 Petrohawk lease.

A.      The Royalty Issue

On August 26, 2004, a lease between Franklin, Peironnet and Prestige Exploration, Inc. ("Prestige") was recorded in the Conveyance records of Caddo Parish, Louisiana.  The term of the lease began June 22, 2004, with a primary term of three years.  This lease was subsequently assigned to Matador Resources ("Matador") on October 13, 2004.[4] This lease will be referred to as the 2004 Matador lease.

Royalties on the gas produced from the property were to be paid to Franklin and Peironnet at one fifth (1/5 or 20%) of the higher of the value of the "gross proceeds" received by Matador or a fair and reasonable price for the area determined by arms-length negotiations.[5]

Matador was developing the Cotton Valley formation, which is an area above the Haynesville Shale formation.  Due to a horizontal depth clause[6] in the Matador lease, the Matador lease would expire at the end of the three-year term because there had been no drilling to a depth of 10,500 feet. Therefore, Matador desired to extend the lease by eighteen (18) months to the 168.95-acre tract to keep the lease from expiring.

In an effort to extend the lease, Matador contacted Regions in June 2007. Regions was handling the oil and gas assets of Franklin and Peironnet. Regions originally assigned Hand to

---

[3] [Doc. No. 283]
[4] [Doc. No. 205-4], (Exh. PX-4)
[5] [Doc. No. 205-3, ¶ 3(b)(1)], (Exh. PX-3)
[6] "Pugh" clause

3

manage the property. Due a reorganization of files, Regions transferred the Franklin and Peironnet property to Moore. Matador representative, Russell Mouton ("Mouton"), spoke with Moore about the proposed extension of the 168.95-acre tract on May 14, 2007.  The parties negotiated and came to an agreement to extend the Matador lease as to the 168.95 acres for a lease bonus price of $75.00 per acre.

Although the parties negotiated an extension only to the 168.95-acre tract, when the proposed written lease extension was sent to Moore, the lease extension did not limit the extension to the 168.95-acre tract and limiting language was not added by Moore.  The legal effect of this extension was that it extended the lease by eighteen months to the entire 1805.34-acre tract, including the deep rights.  The lease extension was signed by Moore on August 22, 2007.[7] Unfortunately, the extension was executed approximately seven months prior to the Haynesville Shale announcement in March 2008.

The mistake in the lease extension resulted in a cloud on the Plaintiffs' title after the Haynesville Shale project was announced.  This cloud on title kept Franklin and Peironnet from signing a lease to the deep rights.  However, Petrohawk Energy Corp. ("Petrohawk") thought Plaintiffs would be successful in a lawsuit against Matador to obtain their deep rights back, and they joined Plaintiffs in this suit. Petrohawk was willing to offer Franklin and Peironnet a "top lease" in the event there were successful in the lawsuit. They ultimately were not successful.[8]

The negotiations with Petrohawk began in April 2008, and concluded on July 18, 2008, when Regions accepted Petrohawk's offer letter.[9] The agreement provided: 1) $8,750.00 per acre

---

[7] [Doc. No. 205-5], (Exh. PX-5)
[8] *Peironnet v. Matador Resources Co.,* 144 So.3d 791 (La. 2013).
[9] [Doc. No. 205-14], (Exh. PX-20)

4

lease bonuses for the acreage;[10] 2) royalties of 25%; 3) a three-year primary term; and 4) Petrohawk paying up the $50,000.00 in attorney fees for the state lawsuit against Matador.[11]

In a prior Opinion[12], this Court found that Franklin and Peironnet sustained no lease bonus damages because Regions accepted Petrohawk's offer and received the same amount of lease bonuses ($8,750.00 per acre) that they would have received even without Moore's error.  However, there remains an issue regarding royalty damages. The Petrohawk lease would have paid 25% royalty compared to the Matador 20% royalty.  Although Franklin and Peironnet received the lease bonuses, they did not receive the 25% royalty under the Petrohawk lease because Petrohawk was not able to drill on Plaintiffs' property.  This was directly caused by the fault of John Moore.

The determination of whether royalty damages are owed to Franklin and Peironnet depends upon the type of each royalty.  There was conflicting testimony at the original trial between Plaintiffs' expert Robert McGowen ("McGowen") and Defendant expert David N. Fuller ("Fuller") as to whether the Petrohawk lease royalty provision was a "gross proceeds" royalty or an "at the wellhead" royalty.  There is an important distinction between these two types of royalties. The parties do not contest that the Matador 20% royalty lease was a "gross proceeds" royalty where expenditures for processing, compressing, and transporting are not taken out of the royalty owner's share.

An "at the wellhead" royalty provision results in costs for processing, compressing, transporting, and other costs being taken out of the royalty paid to the owner.  There is no dispute that if royalty percentages are the same, the landowner receives more royalties for a "gross proceeds" royalty than an "at the wellhead" royalty.

---

[10] Less than the then market value due to the cloud on title.
[11] [Doc. No. 205-8]
[12] [Doc. No. 207]

**B.     The Leases**

The royalty provisions of two leases are at issue:  1) 2004 Matador lease; and 2) 2008

Petrohawk lease.

**1.     2004 Matador Lease**

The royalty provisions of the 2004 Matador lease read as follows:

3.   The royalties to be paid by Lessee on production from wells on the leased premises or on lands pooled therewith are:

(b)  The royalty on gas, including casinghead gas or other gaseous substances produced from the leased premises shall be as set out below.  However, Lessee hereby agrees, without further notice, to market Lessor's royalty portions of the said gas so long as any part of Lessee's portion of said gas is being sold and/or marketed.  Lessee further agrees that all such sales must be at a price that is fair and reasonable for the area as determined by "arm's length" negotiations and must be at least equal to the gross amount being paid for Lessee's gas, casinghead gas, or other gaseous substances at the wellhead, unless otherwise set forth below.  Lessee also further agrees that Lessor shall never be obligated in any manner to take Lessor's royalty portion in kind.

(1)  On gas sold at the well or sold or used off the leased premises (other than for processing at a plant as described in paragraph 3(b)(3) hereof) one-fifth (1/5) of the higher of the value of the "gross proceeds" received by Lessee or a fair and reasonable price for the area determined by "arm's length" negotiations.[13]

No one disputes that the 2004 Matador lease has a "gross proceeds" royalty provision of

20%.  The dispute lies with the 2008 Petrohawk lease.

**2.     2008 Petrohawk Lease**

The royalty provisions of the 2008 Petrohawk lease read as follows:

4.(b) On gas, including casinghead gas, or other gaseous substance produced from said land and sold or used off the premises or for the extraction of gasoline or other products therefrom, the market value at the well of one-eighth.

The 2008 Petrohawk lease also makes reference to attached Exhibit "A", which reads:

See Exhibit "A" attached hereto and made a part hereof for additional provisions.

---

[13] [Doc. No. 205-3], (Exh. PX-3)

The pertinent provisions of Exhibit "A" of the 2008 Petrohawk lease reads as follows:

**Exhibit "A"[14]**

1.      In the event of a conflict between the language as stated in this Exhibit "A" and the language as stated hereinabove, the language in Exhibit "A" shall prevail.

3.a.      It is hereby agreed and understood between the parties hereto that wherever the term of one-eighth (1/8) appears in the printed lease form attached hereinabove, said term is hereby deleted and the term 25% is inserted and substituted, therefore.

3.c.      There shall be no cost charged to the royalty interest created under this lease, except severance and applicable taxes.

There appears to be no dispute that the first page of the 2008 Petrohawk lease sets forth a royalty of one-eighth (1/8) value "at the wellhead." There is also no dispute that provision 3.a. of Exhibit "A" changes the royalty from one-eighth to 25%. The dispute lies in whether 3.c. of Exhibit "A" changes the terms from an "at the wellhead" royalty to a "gross proceeds" royalty.

**C.      June 20, 2023 Trial Testimony**

The June 20, 2023 trial was to determine, by extrinsic evidence, the intent of the parties as to whether 3.c. of Exhibit "A" attached to the 2008 Petrohawk lease changes the royalty provisions from an "at the wellhead" royalty to a "gross proceeds" royalty. The determination is significant because a "gross proceeds" royalty does not allow deduction of post-production expenses (except severance taxes) while an "at the wellhead" royalty does allow deduction of post-production costs.

---

[14] [Doc. No. 205-9], (Exh. PX-13)

1.      **Edward Waller (Video Deposition)**

Edward Waller ("Waller") is a Regions Bank property manager who helps manage the oil and gas properties held by Regions Bank's trust department. Waller stated his job is to represent the best interests of his clients and to get clients as much money as possible.

Part of his job requires negotiating lease terms. Waller testified the Haynesville Shale boom made negotiating oil and gas leases in this area easier because the landowners were in a favorable position. Another part of his job was to make sure oil and gas royalties were being paid correctly. Regions Bank's trust department reviews every check received to make sure the royalties are being paid correctly.

Waller had not received the payment records for the parties Petrohawk lease[15] so he is unable to say whether post-production costs were deducted. In reviewing the May 28, 2008,[16] Petrohawk lease, he believed the language in Exhibit "A" meant the lease was intended by the parties to be a "gross proceeds" lease.

2.      **Joey Hand**

Joey Hand ("Hand") is a Regions Bank Senior Vice-President and Oil & Gas Property Manager.  Hand was the property manager for both Franklin and Peironnet. He was involved in negotiating two leases for Franklin and Peironnet with Petrohawk.  These leases were a May 28, 2008 lease,[17] and a July 18, 2008 Petrohawk lease.[18] Other than the legal description of the property's leases, the terms of both PX-12 and PX-13 were identical and involved the exact same

---

[15] [Doc. No. 299-1] (hereinafter referred to as "PX-12")
[16] Comparing PX-12 and PX-13 is important because Petrohawk actually paid royalties to Franklin and Peironnet in PX-12.
[17] [PX-12]
[18] [Doc. No. 205-9] (hereinafter referred to as "PX-13")

8

parties. The main body of both leases are identical and the Exhibit "A" addendum in each lease is also identical.

Hand testified that in attaching the Exhibit "A" addendum to PX-12 and PX-13 his intent was for both PX-12 and PX-13 to be "gross-proceeds" leases. Exhibit "A" for both PX-12 and PX-13 were supplied by Regions Bank. The main body of the lease for both PX-12 and PX-13 were supplied by Petrohawk. Hand testified that in negotiating the two leases, his intent was to get Franklin and Peironnet better deals than they had.

Hand also reviewed the royalties paid out on the May 2008 Petrohawk lease. Hand testified the owner's side did not show post-production costs being charged to Franklin and Peironnet. Hand also reviewed other leases he had negotiated with Petrohawk, and they had the same language as PX-12 and PX-13.

Although Hand had given previous deposition testimony and testified at the June 20, 2023 trial that he intended for PX-12 and PX-13 to be "gross proceeds" leases, when called as a witness by Regions Bank in their part of the case, Hand added that although it was his intent to make PX-12 and PX-13 "gross proceeds" leases, he did not think that he accomplished that.  This Court interprets Hand's testimony to be that his intent was for both PX-12 and PX-13 to be "gross proceeds" leases but based upon Regions Bank's position that PX-13 was not converted to a "gross proceeds" lease, he was legally unable to properly convert the lease with the language he added.

### 3.    Robert McGowen

Robert McGowen ("McGowen") is a petroleum engineer retained as an expert by Franklin and Peironnet. He previously testified at the April 2021 trial. In this hearing, McGowen testified as to oil and gas industry usages and the industry methodology of the calculation and payout of oil and gas royalties.

McGowen examined both PX-12 and PX-13. PX-12 was a lease executed by Franklin and Peironnet with Petrohawk in May 2008, covering 665 acres. Royalties were paid by Petrohawk to Franklin and Peironnet on PX-12. Royalties were not paid by Petrohawk to Franklin and Peironnet on PX-13. PX-13 was a "top-lease," which is a lease executed when another lease is in effect, and would only take effect if the lease in effect was cancelled or expired. PX-13 never took effect because litigation with Matador over the 2004 Matador lease was unsuccessful.

The language and the parties in both PX-12 and PX-13 were identical. McGowen testified the base lease in both PX-12 and PX-13 was a market value "at the wellhead" lease with a 1/8 royalty provision. However, Exhibit "A" changed the royalty from 1/8 to 1/4 and added an overriding provision that there would be no cost charged to the owner's royalty interest except severance and applicable taxes. McGowen testified that it is customary in the oil and gas industry to have a form lease overridden by an addendum. McGowen also testified it was not unusual in the oil and gas industry to not use the term "gross proceeds" or "market value at the well."

Additionally, McGowen examined all of the monthly pay records of royalties paid to Franklin and Peironnet under PX-12 from 2010 to 2023. McGowen also looked at the annual statements for each year. McGowen testified he did a cross-check by making sure a sample part of the production paid coincided with the production that was reported by the operators to the Louisiana Department of Conservation.

McGowen testified that according to his examination of the monthly pay records and annual reports, Petrohawk paid royalties to Franklin and Peironnet without deduction post-production costs (except severance and taxes). In other words, McGowen testified Petrohawk paid royalties on PX-12 as a "gross-proceeds" lease.  According to McGowen, no deductions were made to Franklin and Peironnet for transportation, processing, compression, and other post-

10

production costs. McGowen never saw any evidence showing that Regions Bank's trust department ever disagreed with the way Petrohawk was paying royalties on PX-12.

### 4. John D. Collinsworth

John Collinsworth ("Collinsworth") is a professional landman who testified at the April 2021 trial. He testified at the June 28, 2023 trial as to industry usages in mineral leasing in northwest Louisiana. Collinsworth testified that the language in Exhibit "A" of both PX-12 and PX-13 is language customarily used by the oil and gas industry in northwest Louisiana to reflect a gross-proceeds royalty provision.

Collinsworth testified there are a number of ways to express a gross-proceeds royalty provision in northwest Louisiana and in his opinion, the language Exhibit "A" of PX-12 and PX-13 reflects intent to make the royalty a "gross-proceeds" royalty in northwest Louisiana.

### 5. David Fuller (Deposition Excerpts and Testimony)

David Fuller ("Fuller") was called by Regions Bank as an expert financial analyst. He also previously testified at the April 2021 trial. He did not testify live on June 20, 2023, but his previous trial testimony was referenced[19] and previous deposition excerpts were submitted.[20]

In Fuller's April 2021 trial testimony, he testified that the July 2008 Petrohawk lease (PX-13), was an "at the wellhead" lease, which would have required deduction of post-production costs had royalties been paid to Franklin and Peironnet. He testified he was not giving a legal opinion, but stated the parties could easily have used the words "gross proceeds" had the parties been intending to change the type of royalty provision when Exhibit "A" was added.

Additionally, Fuller testified that in the absence of the lease agreement, he disputed that McGowen was able to look at the check stubs showing payments to Franklin and Peironnet by the

---

[19] [Doc. No. 215, pp. 1-47]
[20] [Doc. Nos, 83, 85 and 82]

PX-12 lease and determine whether post-production costs were being deducted from the royalty. Fuller did state you can "make an inference" because he can see that the expenses listed were not deducted from the owners, but that the records McGowen examined were insufficient to make a determination of whether the royalty payments were "gross proceeds" or market value at the well.

## II.     LAW AND ANALYSIS

The interpretation of a contract is a legal question. *Gulf Engineering Co. v. Dow Chemical Co.*, 961 F.3d 763, 766 (5th Cir. 2020). Under Louisiana's Civil Code, contractual interpretation is the determination of the common intent of the parties 961 F.3d at 766. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. Civ. Code Art. 2046. If, however, a contract's language is ambiguous, extrinsic evidence is admissible to interpret the intent behind an ambiguous provision. *Greenwood 950 LLC v. Chesapeake La., L.P.*, 683 F.3d 666, 668-69 (5th Cir. 2012).

As previously explained, this Court found provision 3(c) in Exhibit "A" of PX-13 was ambiguous and subject to more than one interpretation.[21] The June 20, 2023 hearing was to determine whether the parties' intent was to convert the 2008 Petrohawk lease (PX 13) from an "at the wellhead" lease to a "gross proceeds" lease.

### A.     Regions Bank's Position

Regions Bank continues to maintain the pertinent provisions are not ambiguous. Regions argues that pursuant to *Wall v. United Gas Public Service Company*, 152 So.561 (La. 1934) and subsequent case law, royalties in Louisiana are analyzed using a four-step process. The process requires: 1) calculating the market value at the well using either comparable sales or the reconstruction approach; 2)  determining the royalty percentage by multiplying the market value

---

[21] [Doc No. 242 pp.13-15]

at the well by the royalty percentage; 3) deducting the permissible post-production costs; and 4) making the royalty payment.[22]

Regions maintains that all 3(c) of Exhibit "A" means is that after the royalty is calculated, no costs can be charged to that interest except severance and applicable taxes. According to Regions' position, post-production costs are held out when calculating the royalty and therefore Exhibit "A" 3(c) does not change the lease from an "at the wellhead" to a "gross proceeds" lease.

Regions' alternative position is that Franklin and Peironnet have the burden of proof and are unable to prove that the intent of the parties was to convert PX-13 from an "at the wellhead" lease to a "gross proceeds" lease. Regions cites the testimony of Fuller and Hand. Fuller testified Plaintiffs' expert could not determine how the comparable lease PX-12 was paid by looking at the payment receipts. Hand testified he intended to create a "gross proceeds" lease but did not believe he had done so.

### B.  Plaintiffs' Position

Plaintiffs Franklin and Peironnet maintain that provision 3(c) of Exhibit "A" of the 2008 Petrohawk lease is ambiguous and that they have proven that the intent of the parties was to change PX-13 from an "at the wellhead" lease to a "gross proceeds" lease.

Plaintiffs cite the testimony of Hand, Waller, McGowen and Collinsworth. Hand, who negotiated PX-13, testified it was his intent to change PX-13 from an "at the wellhead" lease to a "gross proceeds" lease. Waller also testified that was the intent.

McGowen testified that, after examining the monthly pay records of PX-12, an identical lease between Plaintiffs' and Petrohawk, Petrohawk was paying royalties to Plaintiffs without deducting post-production costs. In other words, Petrohawk paid royalties under PX-12 as a "gross

---

[22] Ottinger, Louisiana Mineral Lease: a Treatise (2016)

proceeds" lease. McGowen further testified that the language of Exhibit "A" of PX-13 was customary in the oil and gas industry for converting an "at the wellhead" lease to a "gross proceeds" lease.

Collinsworth, a professional landman, also testified that the language in Exhibit "A" of PX-13 reflects language customarily used in the oil and gas industry in northwest Louisiana to convert an "at the wellhead" lease to a "gross proceeds" lease.

### C.    ANALYSIS

This Court believes Franklin and Peironnet have proven, by extrinsic evidence, that the intent of the parties in adding Exhibit "A" to PX-13 was to create a "gross proceeds" lease that did not deduct post-production costs except for severance and other applicable taxes.

Both Hand and Waller, the Regions Bank employees that negotiated the lease, testified that the intent in adding Exhibit "A" to PX-13 was to create a "gross proceeds" lease. This is corroborated by the favorable conditions at the time the terms of the lease were negotiated. Although Hand did testify that, after the fact, he believes he intended, but did not create a "gross proceeds" lease, that testimony was a legal conclusion of an issue to be decided by this Court.[23]

McGowen's testimony is significant with regard to the royalty payments. An identical lease (PX-12) between Petrohawk and Plaintiffs paid royalty payments to Plaintiffs as a "gross proceeds" lease rather than as an "at the wellhead" lease. PX-12 was a May 2008 lease and PX-13 was a July 2008 lease. Since the provisions of both leases, including Exhibit "A", were identical, Petrohawk would more likely than not have paid the royalties to Plaintiffs on PX-13 without deducting post-production costs.

---

[23] Additionally, this Court notes that, if in fact Hand failed to properly convert PX-13 to a "gross proceeds" lease as intended, it could open up Regions Bank to another lawsuit by Plaintiffs.

Louisiana Civil Code Article 2053 requires ambiguous provisions of a contract to be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the parties. These factors favor Plaintiffs. The terms of the contract were negotiated and provided by Regions Bank. Plaintiffs had no part in the negotiations. Additionally, an identical lease agreement between the same parties paid royalties to Plaintiffs without deduction of post-production costs.

Even if Regions is correct in their analysis of how a royalty is computed, that analysis does not apply here. This Court believes the terms of the lease were ambiguous, subject to more than one meaning, The weight of evidence presented at the June 20, 2023 hearing shows the intent of the parties was to convert the 2008 Petrohawk lease to a "gross proceeds" lease.  Because an identical lease agreement (PX-12) paid royalties to Franklin and Peironnet without deducting post-production costs, this Court finds Plaintiffs have proven they were damaged due to the fault of Regions by Plaintiff's receiving 20% royalties under the 2008 Matador lease instead of 25% royalty payments under the 2008 Petrohawk lease.

The issue of damages was bifurcated[24] from the determination of the intent of the parties. Because that determination has now been made, the issue of damages can now be determined. This Court will allow briefing by the parties on the damages issue in accordance with the briefing set herein.

## III.   CONCLUSION

For the reasons set forth herein, this Court finds the intent of the parties by the addition of Exhibit "A" to the 2008 Petrohawk lease PX-13 was to create a "gross proceeds" lease without deduction of post-production costs, except for severance and applicable taxes.

---

[24] [Doc. No. 283]

15

This Court also finds Franklin and Peironnet have been damaged as a result of the fault of Regions Bank employee John Moore.

A briefing schedule on the damage issue is set forth as follows:

Plaintiffs' brief is due by September 6, 2023;

Defendants' brief is due within 20 days of the filing of Plaintiffs brief;

Plaintiffs' reply brief is due within 7 days of the filing of Defendants' brief.

No additional evidence or testimony will be allowed in making the damage determination. Arguments should be made by the parties based on the evidence and testimony previously submitted.

MONROE, LOUISIANA this 17th day of August 2023.

**TERRY A. DOUGHTY**
**UNITED STATES DISTRICT JUDGE**